UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  |  | CONSOLIDATED CASES |
|  |  | PRISONER |
| FRANCIS ANDERSON | : | CIVIL NO. 3:02CV1165 (RNC)(JGM) |
| v. | : |  |
| DAVID BUDLONG, ET AL. | : |  |
| -------------------------------------------------------- |  |  |
| FRANCIS ANDERSON | : | CIVIL NO. 3:02CV1181 (RNC)(JGM) |
| v. | : |  |
| EDWARD BLANCHETTE, ET AL. | : | OCTOBER 15, 2004 |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.     BACKGROUND**

The facts of this case are stated in defendants material facts in support of this Motion For Summary Judgment.

The plaintiff, Francis Anderson is presently incarcerated at the Northern Correctional Institution. He alleges the defendants are denying him treatment in violation of the Eight Amendment. Plaintiff seeks an order requiring the defendants to restart his treatment.

**II.     LEGAL STANDARD**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Rule 56(c), Fed. R. Civ. P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). A court must

grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . '" Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted).  A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248).  After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

To defeat a motion for summary judgment that is supported by documentary evidence and sworn affidavits, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  He "must come forward with enough evidence to support a jury verdict in [his] favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citation and internal quotation marks omitted).  The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523.  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

When one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. See Burgos v. Hopkins, 14 F.3d 787, 790 2d Cir. 1994). Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

### III.  DELIBERATE INDIFFERENCE STANDARD

Deliberate indifference by prison officials to a prisoner's serious medical or mental health need constitutes cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). To prevail on such claim, however, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to serious medical needs. Id., at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical or mental health care or the wanton infliction of unnecessary pain by prison personnel. Id., at 104-05. Mere negligence will not support a section 1983 claim; the conduct complained of must shock the conscience or constitute a barbarous act. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); Martinez v. Mancusi, 443 F.2d 921, 923 (2d Cir. 1970).

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." Estelle, 429 U.S. at 105-06. Inmates do not have a constitutional right to the treatment of their choice. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison

officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  <u>Chance v. Armstrong</u>, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference standard.  <u>Id.</u> at 702.  "[T]he alleged deprivation must be, in objective terms, sufficient serious."  <u>Id.</u> (internal quotations marks omitted).  Thus, not all medical or mental health conditions satisfy this component of the standard.  <u>See Id.</u>  Rather, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'"  <u>Harrison v. Barkley</u>, 219 F.3d 132, 136 (2d Cir. 2000) (quoting <u>Chance</u>, 143 F.3d at 702).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind."  <u>Chance</u>, 143 F.3d at 702.  "An official acts with the requisite deliberate indifference when that official 'knows of an disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  <u>Id.</u> (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)).

**IV.**   **ARGUMENT**

As determined by this Court in its recommended ruling dated September 29, 2003 and adopted on February 26, 2004, three doctors, all of whom are infectious disease specialists, serve on the Hepatitis C Utilization Review Board (URB) for determining treatment issues for Hepatitis C Inmates.  The plaintiff has Hepatitis C.  Hepatitis C is a viral illness which affects

their liver. It is a chronic disease, twenty to thirty percent of patients with Hepatitis C develop cirrhosis, and ten percent develop end-state liver disease. Consistent with CDC and NIH guidelines, not all patients with Hepatits C automatically receive treatment; instead a doctor evaluates the following factors: the degree of Hepatitis C; the patient's other associated medical diseases; the patient's mental health status; and competing medications taken by the patient. A patient may have Hepatitis C for as long as thirty years before developing cirrhosis. As a result, therapy for Hepatitis C is "never critical"; there is no difference, medically speaking, from instituting therapy now as opposed to one year from now. Many patients with Hepatitis C never require any treatment at all; instead, they are just carefully monitored by lab studies and clinical assessment.

The "gold standard" for treatment of Hepatitis C is Pegylated Interferon, given by injection once a week and Ribavirin, taken in pill form twice a day. The treatment lasts for forty-eight weeks. This therapy is "potentially very toxic" and can be "difficult to manage." Among the hematologic complications are suppressed red blood count (causing anemia, which can be severe enough to require transfusions), suppressed white blood count (increasing risk of infection), and suppressed platelet count (increasing risk of hemorrhaging and other clotting issues). These complications occupy several pages in the Physicians' Desk Reference. The therapy can also trigger psychiatric problems, including depression and the potential for suicide. After three to six months of treatment, a patient's Hepatitis C viral load is tested. If the patient has a "detectable" viral load in the blood stream, the treatment is discontinued; however, if the

patient has no detectable viral load, he or she is considered a "long-term responder," and upon completion of the therapy, should remain in that stage for five years.

The issue of compliance for patients with Hepatitis C is extremely important, because lack of compliance can lead to residual issues, rendering the therapy useless. Just like tuberculosis, Hepatitis C can develop a resistance to treatment if a patient is not compliant. If a patient is not compliant, Hepatitis C becomes impossible to treat and a patient then would shut himself out of future therapy.

Based upon the results of plaintiff's blood tests and liver biopsy, the three members of the URC initially agreed that plaintiff was suitable candidate for treatment, after "detail[ed]" discussions; their only reservation was whether plaintiff's behavioral issues might interfere with therapy. The URC was aware of plaintiff's past conduct while institutionalized, but decided that it was the plaintiff's best interest to begin him on this regimen. Given the risk of non-compliance, plaintiff received intensive counseling on this issue during a meeting with Dr. Gittzus, Nurse Michele Cabana (an infectious disease nurse at NCI), Nurse Supervisor Wollenhaupt, and a mental health counselor.

On October 31, 2002, plaintiff signed a "Consent and Compliance Agreement for Hepatitis-C Treatment," which included the following paragraphs:

8. I will cooperate with the treating physician and nurses. . . .

11. I understand that treatment will be stopped if I fail to take all my medication as ordered by my physician.

12. <u>I understand the if my treatment is stopped because of my refusal to take my medication or to cooperate with treatment, it will not be restarted.</u>

The plaintiff was not cooperative with his treating physicians and nurses, in that he did not permit the nurses to observe him actually taking the medication. Lab studies did not show an anticipated moderate drop in red blood cell count (in particular, hemoglobin and hematocrit), which raised a real question as to whether plaintiff was indeed taking his medication. This moderate drop is such a common occurrence in Hepatitis C treatment that doctors look for it in their patients. Dr. Gittzus, accompanied by Nurse Supervisor Wollenhaupt, wanted to discuss this matter with plaintiff, but the plaintiff refused to leave his cell to meet with the medical staff. Dr. Gittzus, with the unanimous support of the other members of the URB, discontinued plaintiff's therapy, in that the "risks outweighed the benefits" because plaintiff's "spotty compliance" increased his risk of resistance while exposing him to potentially toxic medication.

After receiving the March, 2003 Court Order to resume treatment, Dr. Gittzus spent considerable time with plaintiff addressing the ramifications of non-compliance once the medications were resumed; this meeting was also attended by Nurse Wollenhaupt, Infectious Disease Nurse Cabana, and Major (now Warden) Witden. Dr. Chaplin, who is a Supervising Psychologist at NCI and part of plaintiff's treatment team, also discussed the reinstatement of Interferon and Ribavirin with plaintiff.

On May 8, 2003, Nurse Nordell was one of the only two nurses present at NCI, and worked sixteen house that day. Her coworker, Rebecca Robatel, was not permitted to administer Ribavirin because she was pregnant. When Nurse Nordell attempted to give plaintiff

his Ribavirin, he responded that she was not allowed to give him his medication, and that this procedure had been approved by Major Witden and Nurse Supervisor Wollenhaupt. Nurse Nordell indicated that she had never seen any documentation of this arrangement and in fact, none exists. Nurse Robatel gave plaintiff the medication, even though she had been ordered not to come in contact with Ribavirin.

At approximately 10:00 AM, plaintiff called his cell block control center and stated that he felt suicidal. Mental Health Counselor Tom Lateer arrived at approximately 10:20 AM, and plaintiff indicated that he would bang his head against the wall if Nurse Nordell continued to give him his medication. Counselor Lateer reported that plaintiff had said:

> Lynn Nordell is fucking with my medication. Every time she gives it, I'll slam my head up against the wall unit until I get what I want. I said I was suicidal a few weeks ago and Dr. Chaplin and Sh[ei]a Hughes took care of this of this. I'll go the suicidal route until I get what I want.

The plaintiff displayed no overt signs of suicide. Rather, he wanted to choose the nurse who gave him his medicine. Within ten minutes, additional DOC administrators arrived outside plaintiff's cell, including Major McGill, Lieutenant Brian Siwicki and Lieutenant Dennis Oglesby. During this process, plaintiff periodically banged his head against the wall of his cell. Plaintiff complained to Lieutenant Oglesby about Nurse Nordell. Nurse Nordell was informed of this treatment, although she obviously did not hear it directly from plaintiff. Commencing at approximately 10:55 AM to 10:58 AM, the day's events were captured on videotape. On the videotape, plaintiff continued to bang his head against the wall until restrained.

After consulting with Dr. Ronald Hensley, plaintiff was placed in full escort restraints at approximately 11:00 AM and was escorted to the medical screening room to check the "superficial abrasion to [his] frontal lobe"; after further consultation with Counselor Lateer, plaintiff was escorted back to Cell #201 and placed on four-point soft restraints at approximately 11:13 AM, with checks being done every fifteen minutes. Throughout the day, plaintiff continued to make disparaging comments about Nurse Nordell while being videotaped.

At approximately 4:00 PM, plaintiff was transferred to a Medical Cell #4 of the medical infirmary, and placed in four-point restraints, and later transferred to Medical Cell #3 at approximately 5:15 PM to 5:20 PM, this time placed in in-cell restraints. Again, this entire incident was videotaped by DOC personnel.

Just prior to 9:00 PM, as Nurse Nodell entered the medical tier and approached Medical Cell #3 to administer medication to plaintiff, plaintiff stated that he was going to assault her if she attempted to dispense his medication, just as he had threatened twelve hours earlier. Plaintiff requested that another nurse administered the medication to him. Lieutenant Marinelli instructed Nurse Nordell to leave the medical tier, in order to de-escalate the situation. As a result of this threat, plaintiff did not receive his medication.

Dr. Blanchette received several telephone calls that day regarding plaintiff. Dr. Blanchette determined that there was no choice but to discontinue therapy, because it would be medically improper and not in plaintiff's best interests to allow plaintiff to engage in erratic compliance. Dr. Blanchette equated the threat upon Nurse Nordell as constituting a refusal to receive medication. In Dr. Blanchette's opinion, continuing plaintiff on therapy without full

9

compliance would be opening him up to all the risks and none of the benefits of therapy. Plaintiff's situation was a prominent discussion at the next URB meeting, at which the three members again unanimously agreed that it would be detrimental to plaintiff to continue therapy, and that discontinuation was proper and medically necessary.

Subsequently to May 8, 2003, Nurse Nordell has attempted to administer other medication to plaintiff. Unlike other inmates, plaintiff refuses to ingest the medication in front of her, but instead turns his back to her and will not acknowledge her presence.

Plaintiff also has engaged in additional suicidal activities since May 8, 2003. On June 26, 2003, plaintiff ingested glass. On September 6, 2003, plaintiff also swallowed a razor blade, for which he also refused medical and psychiatric assessment. Since his incarceration in 1987, plaintiff had received more than five hundred disciplinary reports ["DR's"] for various behavior issues. At NCI, he has amassed more than an inch of DR's for refusal to take medications or meet with medical staff, regarding his high blood pressure and for mental health matters.

It is clear that there has not been any deliberate indifference to plaintiff's medical needs. Rather, plaintiff's behavior has been such that the treatment regiment required for effective and safe treatment with Pegylated Interferon and Ribavirin cannot be accomplished. The interruptions caused by plaintiff's behavior not only result in the treatment being ineffective, it results in serious other consequences including developing an immunity to the treatment.

The plaintiff has not yet demonstrated sufficient mental health progress to warrant starting the treatment. Although he has shown some improvement, his prison release date is April 2005 would now preclude beginning treatment which cannot be completed with any degree

of assurance and confidence after his release. Indeed, substantial risks would have to be taken. Unfortunately, even if the plaintiff's behavior continues to improve, this treatment can not be stated until the plaintiff is out of prison.

Failure to treat the plaintiff's Hepatitis C with Pegylated Interferon and Ribavirin given the facts of this case does not constitute deliberate indifference to the plaintiff's medical needs in violation of the Eighth Amendment. The defendants are entitled to Summary Judgment.

## V.   CONCLUSION

For all the reasons stated above, defendants' Motion For Summary Judgment should be granted.

> DEFENDANTS,
> David Budlong, et al.
> Edward Blanchette, et al.
>
> RICHARD BLUMENTHAL
> ATTORNEY GENERAL
>
>
> BY:_____/s/_____
>   Michael J. Lanoue
>   Assistant Attorney General
>   110 Sherman Street
>   Hartford, CT  06105
>   Federal Bar No. ct05195
>   Telephone No.: (860) 808-5450
>   Fax No: (860) 808-5591
>   E-mail: michael.lanoue@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent by first-class mail, postage prepaid to the following on this 15th day of October, 2004:

Francis Anderson, Inmate No. 139042
Northern Correctional Institution
287 Bilton Road, PO Box 665
Somers, CT  06071

_____/s/_____
Michael J. Lanoue
Assistant Attorney General