UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  |  | **CONSOLIDATED CASES** |
|  |  | PRISONER |
| FRANCIS ANDERSON | : | CIVIL NO. 3:02CV1165 (RNC)(JGM) |
| v. | : |  |
| DAVID BUDLONG, ET AL. | : |  |
| -------------------------------------------------------- |  |  |
| FRANCIS ANDERSON | : | CIVIL NO. 3:02CV1181 (RNC)(JGM) |
| v. | : |  |
| EDWARD BLANCHETTE, ET AL. | : | OCTOBER 15, 2004 |

**MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

1. In October 2000, plaintiff was diagnosed with Hepatitis C, and in due course was approved for treatment with Interferon and Ribavirin.

2. In October 2002, plaintiff signed a treatment contract, which set forth the treatment procedure, and cautioned plaintiff that the drugs were dangerous and had possible side effects.

3. Plaintiff indicated that he understood that the treatment would last several months, that such treatment should not be interrupted, and plaintiff agreed to cooperate with the medical staff regarding his medication and acknowledged that the treatment would be terminated, and not restarted, if plaintiff were not cooperative.

4. Plaintiff began the treatment in November 2002.

5. The plaintiff was uncooperative because he hid his face from medical personnel and refused to permit staff to check his mouth and tongue to ensure that he had swallowed the

Ribavirin pill, and he further refused to leave his cell when summoned by his treating physician to discuss plaintiff's test results.

6.  Based upon plaintiff's lack of cooperation, Dr. John Gittzus determined that plaintiff had violated the treatment contract and after conferring with other infectious disease specialists, Dr. Gittzus ordered that the Interferon and Ribavirin be discontinued.

7.  Dr. Blanchette is one of three doctors, all of whom are infectious disease specialists, who serve on the Hepatitis C Utilization Review Committee ("URC"), which board approves therapy for inmates with Hepatitis C.

8.  The other two members are Dr. Gittzus and Dr. Richard Artes of Yale-New Haven Hospital.

9.  Hepatitis C is a viral illness which affects the liver.

10. Hepatitis C is a chronic disease; twenty to thirty percent of patients with Hepatitis C develop cirrhosis, and ten percent develop end-stage liver disease.

11. Consistent with CDC and NIH guidelines, not all patients with Hepatitis C automatically receive treatment; instead a doctor evaluates the following facts; the degree of Hepatitis C; the patient's other associated medical diseases; the patient's mental health status; and competing medications taken by the patient.

12. A patient may have Hepatitis C for as long as thirty years before developing cirrhosis.

13. Therapy for Hepatitis C is "never critical"; there is no difference, medically speaking, from instituting therapy now as opposed to one year from now.

14. Many patients with Hepatitis C never require any treatment at all; instead, they are just carefully monitored by lab studies and clinical assessment.

15.     The "gold standard" for treatment is Pegylated Interferon, given by injection once a week and Ribavirin, taken in pill form twice a day.

16.     The Pegylated Interferon treatment lasts for forty-eight weeks.

17.     Pegylated Interferon therapy is "potentially very toxic" and can be "difficult to manage."

18.     Among the hematologic complications are suppressed red blood count (causing anemia, which can be severe enough to require transfusions), suppressed white blood count (increasing risk of infection), and suppressed platelet count (increasing risk of hemorrhaging and other clotting issues).

19.     The therapy can also trigger psychiatric problems, including depression and the potential for suicide.

20.     After three to six months of treatment, a patient's Hepatitis C viral load is tested. If the patient has a "detectable" viral load in the blood stream, the treatment is discontinued; however, if the patient has no detectable viral load, he or she is considered a "long-term responder," and upon completion of the therapy, should remain in that stage for five years.

21.     The issue of compliance for patients with Hepatitis C is "extremely important," because lack of compliance can lead to residual issues, rendering the therapy useless.

22.     Hepatitis C can develop a resistance to treatment if a patient is not compliant.

23.     If a patient is not compliant, Hepatitis C becomes "impossible" to treat and a patient then would "shut himself out" of future therapy.

24.     The three members of the URC initially agreed that plaintiff was a suitable candidate for treatment, after "detail[ed]" discussions; their only reservation was whether plaintiff's behavioral issues might interfere with the therapy. (See, generally, Exh. G).

25. The URC was aware of plaintiff's past conduct while institutionalized, but decided that it was in plaintiff's best interest to begin him on this regimen.

26. Given the risk of non-compliance, plaintiff received "intensive counseling" on this issue during a meeting with Dr. Gittzus, nurse Michele Cabana (an infectious disease nurse at NCI), Nurse Supervisor Wollenhaupt and a mental health counselor.

27. On October 31, 2002, plaintiff signed a "Consent and Compliance Agreement for Hepatitis-C Treatment," which included the following paragraphs:

> 8. I will cooperate with the treating physician and nurses . . . .
>
> 11. I understand that treatment will be stopped if I fail to take all my medication as ordered by my physician.
>
> 12. <u>I understand that if my treatment is stopped because of my refusal to take my medication or to cooperate with treatment, it will not be restarted</u>.

(Emphasis in original).

28. Plaintiff was not cooperative with his treating physicians and nurses, in that he did not permit the nurses to observe him actually taking the medication.

29. Lab studies did not show an anticipated moderate drop in red blood cell count (in particular, hemoglobin and hematocrit), which raised a "real question" as to whether plaintiff was indeed taking his medication.

30. This moderate drop is "such a common occurrence" in Hepatitis C treatment that doctors look for it in their patients.

31. Dr. Gittzus, accompanied by Nurse Supervisor Wollenhaupt, wanted to discuss this matter with plaintiff, but plaintiff refused to leave his cell to meet with the medical staff.

32.     Dr. Gittzus, with the unanimous support of the other members of the URC, discontinued plaintiff's therapy, in that the "risks outweighed the benefits" because plaintiff's "spotty compliance" increased his risk of resistance while exposing him to potentially toxic medication.

33.     After receiving the Court's Order to resume treatment, Dr. Gittzus spent "considerable time" with plaintiff, addressing the ramifications of non-compliance once the medications were resumed; this meeting was also attended by Nurse Supervisor Wollenhaupt, Infectious Disease Nurse Cabana and Major (now Warden) Whidden.

34.     Dr. Chaplin, who is a Supervising Psychologist at Northern Correctional Institution and "part of [plaintiff's] treatment team," also discussed the reinstatement of Interferon and Ribavirin with plaintiff.

35.     On May 8, 2003, Nurse Nordell was one of only two nurses present at Northern Correctional Institution, and worked sixteen hours that day; her co-worker, Rebecca Robatel, was not permitted to administer Ribavirin because she is pregnant.

36.     When Nurse Nordell attempted to give plaintiff his Ribavirin, he responded that she was not allowed to give him his medication, and that this procedure had been approved by Major Whidden and Nurse Supervisor Wollenhaupt.

37.     Nurse Nordell indicated that she had never seen any documentation of his arrangement (and in fact, none exists).

38.     Nurse Robatel gave plaintiff the medication, even though she had been ordered not to come into contact with Ribavirin.

39.     At approximately 10:00 a.m. on May 8, 2003, plaintiff called his cell block control center and stated that he felt suicidal.

40. Mental Health Counselor Tom Lateer arrived at approximately 10:20 a.m. and plaintiff indicated that he would bang his head against the wall if Nurse Nordell continued to give him his medication.

41. Counselor Lateer reported that plaintiff said:

> Lynn Nordell is fucking with my medication. Every time she gives it, I'll slam my head up against the wall until I get what I want. I said I was suicidal a few weeks ago and Dr. Chaplin and Sh[ei]la Hughes took care of this. I'll go the suicidal route until I get what I want.

42. Within ten minutes, additional Department of Correction administrators arrived outside plaintiff's cell, including Major McGill, Lieutenant Brian Siwicki and Lieutenant Dennis Oglesby. During this process, plaintiff periodically banged his head against the wall of his cell.

43. Plaintiff complained to Lieutenant Oglesby about Nurse Nordell. Nurse Nordell was informed of this threat, although she obviously did not hear it directly from plaintiff.

44. Commencing at approximately 10:55 a.m. to 10:58 a.m., the day's events were captured on videotape, which showed that the plaintiff continued to bang his head against the wall until restrained.

45. After consulting with Dr. Ronald Hensley, plaintiff was placed in full escort restraints at approximately 11:00 a.m. and was escorted to the medical screening room to check the "superficial abrasion to [his] frontal lobe."

46. After further consultation with Counselor Lateer, plaintiff was escorted back to Cell #201 and placed on four-point soft restraints at approximately 11:13 a.m., with checks being done every fifteen minutes.

47. Throughout the day, plaintiff continued to make disparaging comments about Nurse Nordell while being videotaped.

48. At approximately 4:00 p.m., plaintiff was transferred to Medical Cell #4 of the medical infirmary, and placed in four-point restraints, and later transferred to Medical Cell #3 at approximately 5:15 p.m. to 5:20 p.m., this time placed in in-cell restraints. This entire incident was videotaped by Department of Correction personnel.

49. Just prior to 9:00 p.m., as Nurse Nordell entered the medical tier and approached Medical Cell #3 to administer medication to plaintiff, plaintiff stated that he was going to assault her if she attempted to dispense his medication, just as he had threatened twelve hours earlier.

50. Lieutenant Marinelli was present at the medical tier in light of the morning incident. After overhearing plaintiff's threat against Nurse Nordell, Lieutenant Marinelli summoned a video camera and, at 9:00 p.m., speaking directly into the video camera and in Nurse Nordell's presence, plaintiff repeated the threat: "I'm going to assault Lynn Nordell for harassing me on the tier today."

51. Plaintiff further requested another nurse administer the medication to him, saying: "I never refused my medications. I need them. I want them. I fought hard to get them back and I'm a m[ental] h[ealth] patient with a bad temper. If I made a threat against you, they would not deny me m[ental] h[ealth] treatment, would they?"

52. Lieutenant Marinelli instructed Nurse Nordell to leave the medical tier, in order to "de-escalate the situation."

53. As a result of this threat, plaintiff did not receive his medication.

54. Dr. Blanchette determined that there was "no choice but to discontinue therapy," because it would be "medically improper" and "not in plaintiff's best interests" to allow plaintiff to engage in "erratic compliance."

55. Dr. Blanchette equated the threat upon Nurse Nordell as constituting a refusal to receive medication.

56. Continuing plaintiff on therapy without full compliance would be "opening him up to all the risks and none of the benefits of therapy.

57. Plaintiff's situation was a "prominent" discussion at the next URC meeting, at which the three members again unanimously agreed that it would be "detrimental" to plaintiff to continue therapy, and that discontinuation was "proper" and "medically necessary."

58. The Department of Correction was willing to make "reasonable attempts" to work with plaintiff, but the Department of Correction cannot accede to his objections to certain medical staff; the Department of Correction cannot substitute one nurse for another and create a "special schedule" only for plaintiff for therapy which lasts as long as forty-eight weeks.

59. Subsequent to May 8, 2003, Nurse Nordell had attempted to administer other medication to plaintiff.

60. Plaintiff refused to ingest the medication in front of Nurse Nordell, but instead turned his back to her and would not acknowledge her presence.

61. Since 1987, the plaintiff has received more than five hundred disciplinary reports (DRs) for various behavior issues.

62. While at Northern Correctional Institution, he had amassed more than an inch of Disciplinary Reports for refusal to take medication or meet with medical staff.

63.     The plaintiff has engaged in additional suicidal activities since May 8, 2003. On June 23, 2003, he ingested glass and on September 6, 2003, he swallowed a razor blade after which he refused medical and psychiatric assessment.

The above facts were found by the Court in its Recommended Rulings dated September 29, 2003, following an evidentiary hearing on August 28, 2003, and adopted and approved by the Court on February 26, 2004.

64.     The plaintiff has made some recent progress in his behavior from my discussions with mental health staff at the Northern Correctional Institution, but this is not an appropriate time to begin treatment with Pegylated Interferon and Ribavirin.

65.     The plaintiff has a release date in early April 2005.

66.     The Hepatitis C treatment involving Pegylated Interferon and Ribavirin is a 48-week treatment which requires complete patient compliance not only to be successful, but to avail potentially serious consequences, including developing an immunity to the treatment.

67.     It is not possible to start and complete the above treatment plan prior to the expiration of Mr. Anderson's sentence.

68.     As a result of not being able to complete and monitor the completion of the treatment, it would be clearly against medical judgment to begin treatment now or prior to the completion of Mr. Anderson's sentence.

69.     Failure to begin Pegylated Interferon and Ribavirin under these circumstances is entirely consistent with CDC and NIH guidelines as well as appropriate care under the community standard of care for persons such as Mr. Anderson.

Facts 65-70 are supported by Affidavit of Dr. Blanchette, dated October 14, 2004.

DEFENDANTS
David Budlong, et al.
Edward Blanchette, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:_____/s/_____
Michael J. Lanoue
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05195
E-Mail:  michael.lanoue@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed to the following on this 15th day of October, 2004:

Francis Anderson #139042
Northern Correctional Institution
P.O. Box 665
Somers, CT 06071


_____/s/_____
Michael J. Lanoue
Assistant Attorney General